**GAMMA GROUP, INC., Appellant,**

v.

**TRANSATLANTIC REINSURANCE COMPANY and Home State County Mutual Insurance Company, Appellees.**

No. 05–06–00156–CV.

Court of Appeals of Texas, Dallas.

Dec. 3, 2007.

Rehearing Overruled Jan. 14, 2008.

John Alan Goren, Dallas, for appellant.

Jill M. Cronin, Laura J. Grabouski, Paul J. Van Osselaer, Van Osselaer, Cronin & Buchanan LLP, Austin, Charles J. Cain, Stephen B. Skarnulis, Cain & Skarnulis, L.L.P., Austin, TX, for appellees.

Before Justices RICHTER, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice RICHTER.

 This appeal involves a breach of contract claim asserted by Transatlantic Reinsurance Company ("TRC"), a reinsurer on non-standard automobile insurance policies, and intervenor Home State County Mutual Insurance Company ("Home State"), the ceding and fronting carrier, against Gamma Group, Inc. ("Gamma"), the agent responsible for binding and adjusting the policies.[1]

In two issues, Gamma appeals the trial court's judgment awarding TRC and Home State damages and attorney's fees. Gamma first argues the trial court erred in awarding damages under the contract be-

---

1. "Fronting" is where a primary insurer issues a policy on its forms but all or substantially all of the risk is transferred to the reinsurer. "Reinsurance" is a means whereby a company that issues an insurance policy can allocate or "cede" a portion of the risk it bears on that policy to another insurance company in return for a portion of the premium. *See Great Atl. Life Ins. Co. v. Harris,* 723 S.W.2d 329, 330 (Tex.App.-Austin 1987, writ dism'd); *see also,* Tex. Ins.Code Ann. Art. 4152.001(8) (Vernon 2006).

cause losses and loss adjustment expenses on run-off claims should not have been included in the commission adjustment after Home State transferred the claims adjusting responsibility to a third party.[2] In its second issue, Gamma asserts the trial court erred in awarding statutory attorney's fees for breach of contract because the demand was unreasonable and the evidence was insufficient to establish the statutory prerequisites for recovery. In a cross-issue, TRC and Home State assert the contract provided for commission adjustments based on "incurred" rather than "reasonable" losses. As a result, TRC and Home State contend the trial court erred when it construed the contract to imply that only "reasonable" run-off payments were to be included in the commission adjustment calculation. We affirm the trial court's judgment on the right to recover damages for breach of contract and attorney's fees, but conclude the trial court erred when it reduced the damage award based on an implied term in the contract. Therefore, we reverse the trial court's judgment with regard to the amount of damages awarded. Because the damages can not be calculated with mathematical certainty on this record, we remand the case to the trial court for calculation of damages based on the incurred loss.

## I. FACTUAL AND PROCEDURAL BACKGROUND

*The Home State Program*

■ In May 1995, Home State and Gamma entered into an agency agreement (the "agency agreement") under which non-standard automobile insurance policies were to be underwritten by Home State as the fronting carrier and bound and adjusted by Gamma.[3] The agency agreement provided Gamma would produce the policies, collect premiums, and adjust any resulting liability claims against Home State insureds. In addition to payment of insured's claims, the collected premiums were to be used to make payments to the ceding carrier and reinsurer and for Gamma to pay commissions to itself. Initially, the agency agreement was subject to a reinsurance agreement between Home State and U.S. Capital Insurance Company. In 1996, TRC and Hartford Reinsurance Company ("HartRe") began reinsuring the business produced under the Agency Agreement through a quota-share reinsurance treaty with Home State (the "treaty").[4] The treaty was renewed in 1997 and 1998. By the time of the 1998 renewal, TRC had assumed 90% of the Home State liabilities in exchange for 90% of the premium.

The treaty provided for payment of a "provisional ceding commission" consisting of 21.5% of the collected premium. This commission was to be subsequently adjusted to an "actual ceding commission." The adjustment was based on a ratio of incurred losses to premiums. The adjustments were to continue during the effective period of the treaty and after termination until all losses were set-

---

2. In the context of this case, "run-off" refers to claims under a policy that continued to exist after the insurance treaty or agency relationship terminated.

3. An insurance binder is a contract that provides insurance coverage pending the issuance of an original insurance policy. TEX. INS.CODE ANN. art. 549.001 (Vernon 2006).

4. A witness at trial described a quota-share reinsurance agreement as a portfolio of risks, reinsuring an entire book of business, as contrasted with a facultative reinsurance agreement, which reinsures a single policy. *See also, Unigard Sec. Ins. Co., Inc. v. North River Ins. Co., Inc.,* 4 F.3d 1049, 1053 (3rd Cir. 1993) (discussing facultative and treaty reinsurance).

tled, including those incurred during run-off periods.

The agency agreement fully incorporated the reinsurance treaty and amendments, and required all business coming within the scope of the agreement to be reinsured under the reinsurance treaty. The agency agreement further stated the reinsurer had the right to act on all matters within the scope of the agreement as though the reinsurer were Home State. Any violation of the terms and conditions of the reinsurance treaty resulting in a diminution of the reinsurer's liability to Home State was the sole responsibility of Gamma. The agency agreement also provided that the commission set forth in the reinsurance agreement was to be Gamma's sole and full compensation for business placed with Home State.

Two years after the inception of the Home State program, Home State had disagreements with Gamma about its management of the program. During the same time frame, the Texas Department of Insurance alerted Home State to an "extraordinary" number of complaints made by insureds about Gamma. As a result, Home State decided to withdraw from the arrangement and terminated the Agency Agreement effective January 1, 1999. Although Gamma was not authorized to write new business on Home State policies after the termination date, Gamma was still responsible for adjusting run-off claims on policies placed during the effective period of the agreements.

*The S & C Program*

TRC subsequently joined in a new contractual relationship with State and County Mutual Insurance Company (S & C) as the ceding and fronting carrier and Gamma as the agent responsible for binding coverage and adjusting claims. To this end, in 1999, Gamma, S & C, and TRC executed an agency agreement (the "S & C Agency Agreement") and a reinsurance agreement (the "S & C Treaty").[5] The S & C Treaty was a 100% quota-share agreement under which TRC assumed 100% of the risks in exchange for 100% of the premiums, less commissions, fees, and taxes. Like the Home State treaty, commissions were subject to adjustment based on the ratio of losses to earned premium.

*Claims Handling*

In 2000, outside sources advised TRC of two lawsuits alleging Gamma engaged in improper claims handling practices. Although contractually obligated to do so, Gamma failed to notify TRC and Home State about these claims. One of the claims resulted in a default judgment and a claim for bad faith against Gamma and Home State. Home State also contacted TRC to express concern about Gamma's handling of the run-off business. As a result, in June 2000, TRC conducted an extensive audit of Gamma. Previous audits of Gamma, a company in its infancy, had been conducted by the underwriting department. But the 2000 audit was conducted by the claims department. The claims department was critical of Gamma's aggressive claims handling and was concerned such practices could result in extra-contractual liability. The audit also revealed problems with Gamma's staffing and record-keeping. After the audit, TRC made several efforts to rehabilitate Gamma's claims handling practices but ultimately concluded the efforts were futile. TRC terminated the S & C Treaty by endorsement with respect to all new and renewal business effective January 1, 2002.

---

**5.** Unlike the Home State agency agreement, TRC was a party to the S & C Agency Agreement.

Following termination, Gamma remained obligated to handle run-off claims made on S & C policies.

Despite the termination of the agreements with Gamma, the parties remained concerned about Gamma's ability to handle run-off claims. In November 2002, TRC, Home State, and S & C exercised their contractual authority to terminate Gamma's servicing of run-off claims and transferred the responsibility to an independent third-party administrator, Marshall Contract Adjusters ("MCA"). Prior to the transfer, claim payments were funded by Gamma out of retained premiums. After the transfer, payments for run-off claims adjusted by MCA were paid by TRC and Home State. MCA was paid a flat fee of $250 to open a claim file and $250 when the file closed. Approximately 350 run-off files were transferred to MCA. The claims resulted in payments totaling $4,109,847, all of which was paid by TRC and Home State. TRC and Home State also incurred additional charges of $761,417.32, which included the MCA fees and loss adjustment expenses for run-off claims.

*The Lawsuit*

TRC initiated a lawsuit against Gamma and asserted, *inter alia*, claims for breach of contract, breach of fiduciary duty, and negligence. Home State intervened, mirroring the claims asserted by TRC.[6] Gamma counterclaimed for breach of contract. Prior to trial, the court granted a partial summary judgment for defendants, narrowing the issues to be tried to: (1) whether there was a breach of fiduciary duty; (2) whether there was a breach of contract; and (3) whether the run-off claims and

expenses should be run through the treaties.[7]

Following a bench trial, the trial court ruled in favor of TRC on the breach of contract claim and made findings of fact and conclusions of law. The court found Gamma breached the contract because the run-off claims and expenses should have been run through the treaties and the excess commissions refunded. The court interpreted the contract, however, to require that such claims and expenses be "reasonable", and held that "reasonableness" was a component of plaintiff's claim rather than a mitigation defense. As a result, the court determined what constituted a "reasonable" loss, and used this figure to calculate damages instead of the figure for actual incurred loss. The court further found there was no breach of fiduciary duty. In accordance with the findings of fact and conclusions of law, the court signed a final judgment awarding TRC actual damages in the amount of $514,854.77 for breach of the S & C Treaty, plus attorney's fees, and $786,144.68 to TRC and Home State for breach of the Home State treaty. This appeal followed.

## II. DISCUSSION AND ANALYSIS

*Breach of Contract*

■ The contract provided Gamma would receive a set percentage of the premiums it produced and a sliding scale commission based on the loss ratio. The loss ratio is defined as the "Incurred Loss" divided by the Gross Net Earned Premium Income. An "Incurred Loss" is defined as:

---

6. Home State also asserted claims against two individual guarantors of the agency agreement. These claims were ultimately resolved by summary judgement in favor of the individuals, and are not at issue here.

7. We understand the parties use of the phrase "running the claims and expenses through the treaty" to mean the inclusion of these amounts in the tally of losses for purposes of the commission adjustment calculated by the losses to earned premium ratio.

The sum of the losses and loss adjustment expenses paid plus reserves for outstanding losses and outstanding loss adjustment expenses.[8]

Thus, an incurred loss has three components: (1) losses; (2) loss adjustment expenses; and (3) reserves. At trial, TRC and Home State maintained incurred losses included losses during run-off. Consequently, Gamma was contractually required to factor the run-off into the commission adjustment, and breached the contract when it retained the premiums from which the adjusted commission payments were to be made. The trial court agreed. In its first issue, Gamma insists it is not liable for payment of run-off claims under the treaty because the agency agreement bars recovery when the claims are administered by a third party.[9] Therefore, Gamma claims it was not required to run the MCA loss payments through the treaty to calculate the excess commission refund owed to TRC and Home State. Gamma's argument is directed only to the loss component of the commission adjustment calculation and is premised on paragraph 6.2(E) of the agency agreement. The agency agreement provides:

> [Home State] is responsible for and shall promptly pay all **expenses attributable to the actions of [Home State]** as a result of business produced under this Agreement. This responsibility shall not be altered whether the **expense** is billed to [Home State] or the Agent. These **expenses** include, but are not limited to:

**losses and loss adjustment expenses incurred at the direction of '[Home State].**

(Emphasis added). According to Gamma, Home State retained the right to settle any loss or claim, but could not require Gamma to pay for such a settlement because the payment constituted an expense incurred at Home State's direction. TRC and Home State contend Gamma's construction is unreasonable because it would allow Gamma to retain premiums without utilizing the funds to cover losses, resulting in an ill-deserved windfall for Gamma. TRC and Home State further assert the construction fails to give meaning to each term of the provision and the agreements as a whole. Home State and TRC point out that the commission adjustment provisions are in the reinsurance treaties, not the agency agreements. Further, Article 6.2(E) does not reference commissions or commission adjustments. Instead, it is entitled "[e]xpenses."

The trial court found Gamma's construction of 6.2(E) reads the predicate sentence out of the contract. The key part of the predicate to subpart E is the phrase "expenses attributable to the actions of [Home State]." The court further found that settlements paid for ordinary claims are not expenses that can be attributed to Home State's actions; they are losses caused by insureds under the policies. Therefore, Gamma was required to run the MCA loss payments through the treaty, and breached the contract when it failed to do so. We agree.

■ The agency agreement expressly incorporates the reinsurance treaty and

---

8. Although there were various amendments to the reinsurance treaty during the relevant time frame, but for minor modifications, this definition remained essentially the same.

9. Gamma conceded at trial that all "reasonable" loss payments paid on run-off claims must be run through the S & C Treaty. We therefore consider only the assigned error with regard to the Home State Treaty.

amendments. Instruments pertaining to the same transaction may be read together to ascertain the parties' intent. *See Fort Worth Indep. School Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex.2000). Therefore, we review and refer to the agency agreement and the Home State treaty as one contract.

Neither party asserts the contract is ambiguous. The interpretation of an unambiguous contract is a question of law that we review de novo. *MCI Tel. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650–651 (Tex.1999). The primary objective of contract interpretation is to ascertain the intent of the parties as expressed in the written agreement. *See Nat'l Union Fire Ins. Co. v. CBI Indus. Inc.,* 907 S.W.2d 517, 520 (Tex.1995). The court examines the entire agreement in an effort to harmonize and give effect to all provisions of the contract so no provision will be rendered meaningless. *See City of Midland v. Waller,* 430 S.W.2d 473, 478 (Tex.1968). The interpretation of insurance contracts is governed by the same rules that apply to contracts in general. *Balandran v. Safeco Ins. Co.,* 972 S.W.2d 738, 740 (Tex.1998).

Gamma's reliance on the expense provision in the agency agreement is misplaced. The commission adjustment provision appears in the reinsurance treaty and provides for the inclusion of "all losses" in the commission adjustment calculation. Specifically, the treaty states the first adjustment to the provisional ceding commission is to occur 12 months following the inception of each agreement year, with subsequent adjustments thereafter "until all losses and premiums are paid and settled." The unambiguous phrase "all losses" evidences the parties' clear intent that no losses be excluded. The intent to include losses occurring during run-off in the calculation of "all losses" is evidenced by the paragraph appearing immediately after the commission calculation formula. The provision states:

> After termination, applicable run-off premiums and losses occurring during run-off, if any, will be assigned to the Agreement Year immediately preceding the termination date.

Gamma's responsibility for the run-off following termination of the agreement is also reflected in the provision of the agency agreement which states:

> Notwithstanding the termination of this Agreement, the provisions of this Agreement shall continue to apply to all unfinished business to the end that all obligations and liabilities incurred by each party as a result of this Agreement shall be fully performed and discharged.

Once Gamma collected the premiums, it became obligated to pay claims out of the proceeds. The fact that a claim continued to exist after the agreement terminated did not obviate Gamma's obligation to "fully perform and discharge" the "obligations and liabilities" it incurred once it accepted premiums for the policies. The transfer of the claims administration to a third party was not mentioned, and is therefore presumed immaterial to this obligation.

All parties agree the treaty gives TRC and Home State the absolute right to assume the handling of the run-off claims. In addition, the agency agreement provides Gamma may appoint claims adjustment firms to handle certain settlements and investigations relating to claims. But neither the treaty nor the agency agreement distinguish between run-off claims administered by Gamma and those administered by TRC, Home State, or a third party. We view the absence of distinction as instructive, and indicative of the parties' intent to run all losses through the treaty, regardless of who administers the claims.

Contracts are construed to avoid a construction that is "unreasonable, inequitable, and oppressive." *See Frost Nat'l Bank v. L & F Distrib., Ltd.,* 165 S.W.3d 310, 312 (Tex.2005). Article 6.2(E) of the agency agreement can not reasonably be interpreted as a limitation on or exception to the unambiguous language of the treaty. The article is entitled "expenses," and provides Home State is responsible for expenses "attributable to" and "incurred at the direction of" Home State. As the trial court found, the losses in question were caused by the insured drivers. Transferring the claims handling for these losses did not change the nature of the loss itself. Therefore, the losses can not reasonably be characterized as expenses, attributed to Home State, or deemed incurred at its direction simply because the claims handling responsibility was transferred to MCA. To construe the contract otherwise would be unreasonable.

The construction Gamma advances would also result in a windfall to Gamma. If the losses MCA paid to insureds are not run through the treaty, Home State and TRC are left to fund the claims while Gamma retains the premiums. The treaty, however, clearly contemplates that all losses, including run-off, are to be funded from the premiums. Thus, the trial court did not err in finding that Gamma's failure to run the losses through the treaty and resulting retention of the premiums was a breach of the contract. Gamma's first issue is resolved against it.

*Attorney's Fees*

The trial court found TRC was the prevailing party and awarded it attorney's fees on the breach of contract claim. The court does not state whether the award was based on the contract or a statutory right to recovery. In its second issue, Gamma contends the trial court erred in awarding statutory attorney's fees for breach of contract because the demand was unreasonable. Gamma also argues there was no evidence, or alternatively, factually insufficient evidence to establish the statutory prerequisites for recovery.

A prevailing party cannot recover attorney's fees unless permitted by statute or by contract between the parties. *See Travelers Indem. Co. of Conn. v. Mayfield,* 923 S.W.2d 590, 593 (Tex.1996); *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.,* 835 S.W.2d 75, 77 (Tex.1992); *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 95 (Tex.1999). Gamma claims Home State and TRC failed to assert a contractual basis for recovery, and focuses its attack on the statutory award. We will sustain the trial court's judgment if it is correct on any theory of the law applicable to the case. *See Carrollton-Farmers Branch Ind. School Dist. v. JPD, Inc.,* 168 S.W.3d 184, 188 (Tex.App.-Dallas 2005, no pet.).

In the breach of contract section of its Second Amended Petition, TRC seeks attorney's fees pursuant to TEX. CIV. PRAC. & REM.CODE ANN. § 38.001. There is no specific request for attorney's fees under the contract. But even when a party pleads an incorrect or inapplicable theory or statute, it does not necessarily preclude an award. *See Mitchell v. La Flamme,* 60 S.W.3d 123, 130 (Tex.App.-Houston [14th Dist.] 2000, no pet.). The question is whether a litigant pleads facts, which if true, would entitle him to the relief sought. *Cf. O'Connell v. Hitt,* 730 S.W.2d 16, 18 (Tex.App.-Corpus Christi 1987, no writ) (applicable statute need not be specifically pled to recover attorney's fees; one must plead facts, which if true, establish entitlement to relief sought). Both the agency agreement and the reinsurance agreement were attached to the petition and introduced as evidence at trial. The prayer for relief, couched in more general terms, seeks an award of "attorney's fees." The

breach of contract section under which the request for statutory attorney's fees is made asserts Gamma failed to perform under the contract and caused TRC to suffer damages. Thus, Gamma was on notice TRC was seeking attorney's fees because of its breach of contract. We conclude the pleading suffices to support the recovery of contractual attorney's fees. We turn now to whether such fees were recoverable.

■ The agency agreement provides:

> In the event [Home State] or the Agent shall have to institute any lawsuit to enforce the obligations assumed by the other party under this Agreement, the prevailing party shall be entitled to recover from the other party all costs, expenses, judgments and attorney's fees incurred by the prevailing party in connection with the lawsuit.

As demonstrated by the foregoing, the contract provides for the award of attorney's fees to the prevailing party. Gamma does not dispute TRC and Home State were the prevailing parties.[10] As a prevailing party, TRC was entitled to recover attorney's fees under the contract. Because we conclude TRC was entitled to recover attorney's fees under the contract, we need not reach appellant's remaining arguments. *See* Tex.R.App. P. 47.1. Gamma's second issue is resolved against it.

*Construction of the Contract*

■ We review the trial court's legal conclusions de novo. *See Barber v. Colorado Indep. School Dist.*, 901 S.W.2d 447, 450 (Tex.1995). The trial court relied on the expense provision in the agency agreement to construe the commission adjustment provision in the reinsurance treaty. In so doing, the court concluded "run-off payments must be 'reasonable' in order to

be 'run through the treaty.'" The court explained:

> [T]he logical construction of 6.2E is that if Home State ... overpays a claim through negligence or spite, that would be an expense "attributable to the action of the company" rather than an ordinary loss caused by the action of the insured ... To avoid applying 6.2E to the settlement payments, the payments must be losses caused by the insured (i.e. reasonable).

In a cross-issue, TRC and Home State argue the trial court erred because the express language of the contract does not include the term "reasonable" and there is no basis for the court's addition of this implied term. We agree.

■ Courts do not rewrite contracts to insert provisions parties could have included or imply restraints for which they did not bargain. *See Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 646 (Tex.1996). A court may not add to a contract under the guise of interpretation. *See Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 640 (Tex.App.-Houston [14th Dist.] 2005, no pet.). Although the trial court refers to its determination as contract construction, it has, in effect, inserted an implied covenant requiring that loss payments be reasonable.

■ Implied covenants are not favored in Texas law. *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex.App.-Houston 1998, pet. denied). Thus, it is only in rare circumstances that a court will imply a covenant in a contract. *See Universal Health Serv., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 747 (Tex.2003). A term will not be

---

10. The judgment awards attorney's fees through trial only to "Plaintiff" (TRC). Conditional appellate attorney's fees are awarded to both TRC and Home State.

implied simply to make a contract "fair, wise, or just." *Id.* at 748; *see also, Clovis Corp. v. Lubbock Nat'l Bank,* 194 S.W.3d 716, 719 (Tex.App.-Amarillo 2006, no pet.). A court will only look beyond the written agreement to imply a covenant if necessary to effectuate the parties' intent as disclosed by the contract as a whole. *See Case Corp. v. Hi–Class Business Systems of America, Inc.,* 184 S.W.3d 760, 770 (Tex. App.-Dallas 2005, pet. denied). An implied covenant is necessary to effect the parties' intentions only if the obligation is "so clearly within the contemplation of the parties that they deemed it unnecessary to express it." *Id.* Here, the entire agreement, taken as a whole, does not evidence an intent to measure losses for the commission adjustment calculation by any other standard than that which is expressly provided in the contract. The inclusion of the implied term was not necessary to effectuate the parties' intent.

At first blush, it might seem logical to exclude extraordinary loss payments from the calculation because a reasonableness requirement must be so inherently obvious the parties deemed it unnecessary to express it. But close examination of the precision with which the parties crafted the complex formulae for all calculations in the contract, including those at issue, demonstrates the opposite.

The contractual definition of an incurred loss makes no reference to whether losses and loss adjustment expenses are reasonable. Instead, the agreement specifies an incurred loss is comprised of losses that are actually paid. To adopt the trial court's interpretation of the contract would require us to inject meaning not expressed in words chosen by the parties and placed within the four corners of the agreement. Had these sophisticated businesses intended any analysis of the loss amount before its inclusion in the adjustment calculation, the agreement could easily have included the word "reasonable" and delineated the criteria for its determination. Had the expense provision in the agency agreement been intended as a limitation on the commission adjustment provision in the reinsurance treaty, the provisions could have been cross-referenced, or the expense provision could have at least mentioned commissions.

 Other sections of the contract reflect the parties intended payments and settlements be accepted at face-value. The contract contained a loss settlement clause, known in the industry as a "follow the settlements" provision. A follow the settlements provision obligates a reinsurer to pay claims on policies issued under the treaty as long as the settlements are not "fraudulent, collusive or otherwise made in bad faith, or an *ex gratia* payment." *See North River Ins. Co. v. Employer's Reinsurance Corp.,* 197 F.Supp.2d 972, 977–78 (S.D.Ohio 2002). The purpose of the doctrine is to prevent the reinsurer from second-guessing settlement decisions. *Id.* Prior to trial, TRC challenged a number of claims settled by Gamma, and Gamma moved for summary judgment. The "follow the settlements" clause was one of the grounds upon which Gamma requested and was granted partial summary judgment. Specifically, the trial court held the "follow the settlements provision applies to Gamma's settling of claims, and ... TRC cannot recover from Gamma for any claim settled by Gamma if TRC could not successfully assert a claim against Home State for that settlement." Thus, the court construed the contract to preclude a challenge to Gamma's settlements because they were not reasonable, and refused to distinguish the application of the follow the settlements doctrine based on Gamma's status as Home State's agent. Based on our review of the contract, it is logically

inconsistent to require that loss payments made by MCA be "reasonable" and exempt Gammas's loss payments from the same standard.

Gamma argues the follow the settlements provision is not pertinent to our determination because the prohibition applies only to prevent the reinsurer from second-guessing settlements made by the ceding carrier. But we are not inclined to dismiss the provision as inconsequential simply because it is addressed to the reinsurer. Contracts should be construed as a whole. *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998). Coupled with the precise definition of incurred loss and the absence of an express requirement that losses be "reasonable," we view the follow the settlements provision as illustrative of the parties overall intent to insulate all claim payments from post-payment scrutiny.

 The parties to reinsurance contracts are sophisticated, commercial enterprises. When construing a contract, courts must be mindful of the business activity sought to be served. *See Clear Lake City Water Authority v. Kirby Lake Devel. Ltd.,* 123 S.W.3d 735, 743 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Insurance treaties are contracts of indemnity, not of liability. *See Unigard* at 1054. An implied contractual term subjecting certain claim payments to an amorphous standard of "reason" while exempting others is not consistent with the overall purpose of this contract.

The trial court's construction of the agreement for purposes of determining liability does not harmonize with its construction for determining damages. The court found to avoid the application of the agency agreement expense provision, the payments must be losses caused by the insureds. The court further found losses caused by insureds are not expenses. But even if we assume MCA paid more to settle an insured's loss than Gamma might have paid, a higher payment does not transform the insured's loss into an expense or loss attributable to Home State. The loss remains a loss caused by the insured, albeit one for which a higher settlement was paid.

Gamma characterizes all of the damages sought by TRC and Home State as "cost of completion" damages, and insists such damages must be reasonable before they are compensable. In support of its argument, Gamma relies on *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195 (Tex.2004). *Mustang Pipeline* was a construction case in which the court ruled that a party seeking to recover the cost of completion in a contract case has the burden to prove that the damages sought are reasonable. *Id.* at 200. The damages at issue in *Mustang Pipeline* were those incurred to complete the construction of a pipeline the breaching party failed to timely build. The damages Gamma has challenged in this case, however, are not cost of completion damages. Gamma has challenged the loss component of the calculation, not loss adjustment expenses. The losses incurred are payments made on automobile policies. Neither the incurred losses nor the adjusted commissions are a cost attendant to completion of the contract; both were anticipated under the original contract and occur regardless of who administers the claims. Although the fees paid to MCA for claims handling might be considered cost of completion damages, Gamma did not challenge these fees.

The parties devote considerable argument to which party had the burden of proof as to "reasonable" and whether the inquiry was one of failure to mitigate damages or a component of plaintiff's claim. Gamma also argues the issue was tried by

consent. Because we conclude in our de novo review that the trial court erred by construing the contract to require commission adjustment calculations based on reasonable rather than incurred losses, we need not reach these remaining issues. *See* TEX.R.APP. P. 47.1. The cross-issue is sustained.

*Calculation of Damages for Breach of Contract*

The trial court awarded damages to TRC and Home State for Gamma's breach of contract. In support of the award, the court found:

> [t]he proper measure of damages is the amounts that should have been paid under the treaty by [Gamma] but which were not less the difference between the sums retained by Plaintiffs and (7% of the premium plus 1996 and 1997 loss sharing)....

Using the "reasonable loss" figure $1,110,330 in the calculation, the trial court found $786,144.68 net due to TRC and Home State under the Home State treaty.[11] Using the "reasonable loss" figure $1,025,976, the trial court found the net due to TRC under the S & C treaty was $514,854.77. The court concluded the total principal amount of damages for breach of contract was $1,300,999.45.

We have already concluded the trial court erred when it used the amount of "reasonable losses" rather than "incurred losses" in the damages calculation. TRC and Home State maintain we need only substitute the amount of incurred losses to recalculate the damages and render judgment. Although we agree the only remaining calculation required involves the insertion of actual incurred losses in the formula used by the trial court, the amount of actual incurred losses is not apparent on this record. TRC and Home State refer to contradictory amounts in their briefs and at oral argument. These amounts do not directly reconcile with the damages testimony and exhibits to provide a definite, conclusive, final number for incurred loss under each of the treaties. Therefore, rendition is not appropriate. *See* TEX.R.APP. P. 43.3.

## CONCLUSION

The trial court's judgment on the merits of the breach of contract claim and award of attorney's fees is affirmed. The judgment is reversed as to the amount of damages awarded, and remanded to the trial court for the sole purpose of recalculating the amount of damages due to TRC and Home State. The damages are to be calculated using the methodology previously employed by the court, but with the amount of the incurred loss substituted in the calculation in place of the amount of reasonable loss.

---

11. The court does not specify the amount found as Incurred Loss or the calculation used to reduce this amount to reach the amount of "reasonable loss."