02-10-365-CV












 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.
02-10-00365-CV

 

 


 
 
 Arch Reinsurance Company
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Underwriters Service Agency, Inc.
 
 
  
 
 
 APPELLEE
 
 


 

----------

FROM THE 48th District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

This
appeal arises out of a dispute over a contract among three parties— State
National (not involved in this appeal), Appellant Arch Reinsurance Company, and
Appellee Underwriters Service Agency, Inc.—and a subsequent modification of
that contract negotiated by representatives of Arch and Underwriters.  In
thirteen issues, Arch argues that the contract could not be modified without
State National’s consent; that the evidence is insufficient to support the
jury’s finding that Arch agreed to the modification; that the jury’s findings
that Arch agreed to modify the contract were immaterial; that the modification
violated the contract’s prohibition against assignments; that Underwriters’s estoppel defense failed as a matter of law;
that the jury’s finding against Underwriters’s in one
of the equitable estoppel questions in the charge defeated Underwriters’s
estoppel defense; that the jury’s finding in favor of Underwriters on equitable
estoppel in another question was immaterial; that the trial court erred by
excluding evidence about why State National did not consent to the
modification; that lack of consideration rendered the modification invalid;
that the modification was not retroactive; that the trial court erred by
granting summary judgment on Arch’s fraudulent inducement claims; that the
trial court erred by awarding attorney’s fees to Underwriters; and that Arch is
entitled to an award of attorney’s fees as a matter of law.  Because we
hold that the trial court abused its discretion by awarding attorney’s fees to
Underwriters, we modify the trial court’s judgment to omit that award. 
Because we hold that State National’s consent was not required for the
modification and that the trial court did not err by granting summary judgment
on Arch’s fraud claims, we affirm the remainder of the trial court’s judgment.

Background

The
Agreement

State
National issues insurance policies, Underwriters sells insurance policies, and
Arch provides reinsurance coverage.[2]
 These three parties entered into a Quota Share and Reinsurance Agreement
(reinsurance agreement), as well as a general agency agreement (agency
agreement), which was attached to and referenced by the reinsurance
agreement.  Under these agreements, Underwriters sold (and collected the
premiums on) homeowner policies issued by State National, and Arch agreed to reinsure
State National for one hundred percent of the risk associated with the
policies.  Underwriters turned the premiums over to Arch, receiving a
commission on these premiums.

The
agreement provided that Underwriters would receive a thirty percent commission
on the premiums it collected, but only provisionally, and this provisional
commission would be adjusted depending on the amount of losses taken on the
policies.  If, at the end of the year, Arch suffered fewer losses than
expected compared to premiums earned, Arch would pay Underwriters an additional
percentage on a sliding scale, up to an additional three-and-a-half percent.
 If, on the other hand, losses were higher than expected, Underwriters had
to return to Arch up to three percent of the commissions it had received, so
that Underwriters received only a twenty-seven percent commission.

Within
forty-five days after the end of each month, Underwriters was required to remit
to Arch the ceded net premiums during that month, less Underwriters’s
commission and certain deductions.  Arch was required to provide a report
to State National that included the amount of the commission paid to
Underwriters, and this report was required to be furnished within forty-five
days of the close of the month.

The
agreement contained a provision that neither Arch nor Underwriters could assign
any of its rights or obligations under the agreement without prior written
consent of State National.  It further provided that the agreement could
be amended or modified only by a written agreement executed by all the parties.

The
Dispute

In
2007, Phil Glick, a property underwriter employed by Arch, had discussions with
representatives of Underwriters about Underwriters’s
desire to modify the reinsurance agreement.  Underwriters requested that
Arch agree to increase Underwriters’s minimum
commission from twenty-seven percent to thirty percent.  On December 11,
2007, Glick and a representative from Underwriters signed a document, Addendum
No. 11, to modify the reinsurance agreement.  The addendum provided that
“[e]ffective as of March 1, 2007, and pertaining to
all liabilities that are applicable to [the reinsurance agreement], the loss
and loss adjustment expense are capped” per a scale set out in the addendum.
 This scale capped Arch’s losses for certain years at specified amounts.
 The addendum also amended paragraph 8.06 of the reinsurance agreement,
the provision that provided the adjusted commission rate used to determine the
amount of Underwriters’s commission.  This
amendment raised Underwriters’s minimum commission to
thirty percent, as had been requested by Underwriters.

On
December 14, 2007, three days after signing Addendum No. 11, Glick emailed his
resignation to John Rathgeber, chairman of Arch,
stating among other things that “[b]ecause of the
problems with the . . . . [State National] contracts I
feel as if my job performance has not been acceptable to myself.”  When Rathgeber met with Glick to discuss the email, he learned
about Glick’s execution of Addendum No. 11.  Shortly after that, Rathgeber contacted representatives with both Underwriters
and State National and stated that Arch did not agree to the addendum and that
Glick was not authorized to agree to it.  State National had not reviewed
or signed the addendum.

The
Lawsuit

In
2008, Arch filed suit against Underwriters for breach of contract and for
declaratory relief.  Arch alleged that for the agreement years 2003
through 2006, Underwriters did not furnish reports to Arch and did not return
commissions that Arch was owed.  Through amended petitions, Arch also
challenged Addendum No. 11 on fraudulent inducement grounds.

Underwriters
filed a combined traditional and no-evidence motion for summary judgment on the
fraudulent inducement claims.  Among other grounds, Underwriters alleged
that Arch’s fraud claims were barred by the economic loss rule and that there
was no evidence of the elements of fraud.  In a separate motion,
Underwriters also sought summary judgment on the issue of whether Glick had
apparent authority to act on Arch’s behalf with respect to Addendum No.
11.  The trial court granted these motions without specifying the grounds.
 The breach of contract claim then proceeded to a jury trial.

David
Cleff, a representative of State National, testified
at trial that he had not approved Addendum No. 11 and that no one at State
National with authority to approve it had done so.  He further testified
that no one at Arch had prevented him from approving Addendum No. 11.  But
he then stated that after the addendum had been given to him to review but
before he had a chance to review it, “the broker contacted State National and
said that we didn’t need to look at it.”  He stated that he subsequently
reviewed Addendum No. 11 and that State National did not agree to it. 
When asked why State National did not agree to it, Underwriters objected on the
ground that any opinions “formed after the fact” were irrelevant.  The
trial court sustained the objection.  Underwriters also objected on
hearsay grounds when the State National representative was asked if anyone had
ever asked whether the changes in the addendum were acceptable to State
National, and the trial court sustained the objection.

Rathgeber
also testified.  When asked if he had asked representatives of State
National not to sign Addendum No. 11, he answered that he had asked them if
they were aware of the addendum and whether they agreed with it, and “[a]fter they explained their knowledge of the situation and
their knowledge of the endorsement, I did ask if they could please not execute
it while we try to work things out with [Underwriters].”

In
question one part A of the jury charge, the jury was asked if it found that
Arch agreed to modify the agreement in 2007 to excuse Underwriters’s
liability for return commissions for each agreement year.  The jury
answered “yes.”  In part B of question one, the jury was asked if Arch
agreed to modify the agreement in 2007 to revise Underwriters’s
minimum commission to thirty percent for each agreement year.  The jury
again answered “yes.”

Question
two of the charge was also a two-part question.  The question asked
whether the jury found that Arch was equitably estopped
from denying the 2007 modifications to the agreement on the grounds that State
National did not agree to Addendum No. 11.  Part A asked whether the jury
found estoppel because “State National’s failure to sign Addendum No. 11 was
caused by Arch’s actions.”  The jury answered “yes” to this part of the
question.  In part B, the charge set out the elements of equitable
estoppel (that is, that Arch made a false representation or concealed material
facts with the intention that Underwriters would rely on the representation and
that Underwriters relied to its detriment).[3] 
The jury answered “no” to this part of the question.

The trial
court entered a final judgment ordering that Arch take nothing on its claims
and that Underwriters recover attorney’s fees under section 37.009 of the civil
practice and remedies code[4] in
the amount of $443,760, plus additional contingent appellate attorney’s fees.

Analysis

Is
any modification to the reinsurance agreement invalid as a matter of law for
want of State National’s consent?

Arch
argues in its first issue that any modification of the reinsurance agreement,
whether by Addendum No. 11 or any other communications between Arch and
Underwriters, was invalid as a matter of law without State National’s
consent.  The question of whether parties to an agreement intended to
modify their agreement is a question of fact.[5]  In this case, the jury found that
Arch and Underwriters agreed to modify the reinsurance agreement.

Arch
maintains first that the plain language of the reinsurance agreement requires
that all three parties agree to any amendment.  Arch also argues that
Addendum No. 11, which Underwriters drafted, recognizes the need for all three
parties to agree.  Arch further argues that Texas law requires all parties
to a contract to agree to any modification of the contract and that two parties to a three-party agreement cannot modify
the agreement when the modification affects the third party.  Arch then
argues that Addendum No. 11 has a substantial impact on State National and that
it therefore required State National’s consent to be valid.

Addendum
No. 11 stated that it was entered into among Arch, Underwriters, and State
National, but as Arch points out, State National never agreed to this addendum.
 The addendum stated that State National “agreed to cut-off the 2006 term
effective February 28, 2007, and transfer the Unearned Premium Reserve of
$5,404,779 to the 2007 term.”  Because State National did not agree to the
addendum, it cannot be bound by this language.[6]  But Underwriters maintains that the
remainder of the addendum is enforceable even without State National’s consent
because it had no substantial effect on State National.

Arch
counters Underwriters’s argument by asserting that
Addendum No. 11 did have a substantial impact on State National.  The
addendum modified the reinsurance agreement by changing the provision under
which Arch was liable for one hundred percent of the losses incurred in
connection with the risks covered by the agreement to one in which Arch’s
liability was capped.  Arch contends that because Addendum No. 11 caps
Arch’s liability to cover losses, it would leave State National unreinsured for losses that exceeded the caps.

Underwriters
argues, however, that even with the execution of Addendum No.
11, State National was fully indemnified against any adverse effect.  It
points to a provision of the agency agreement in which Underwriters agreed to
indemnify and hold State National harmless

from and against any and all actions, causes of actions,
suits, arbitrations, or proceedings of any kind, liabilities, losses, claims,
damages, costs, or expenses . . . incurred by [State National] by reason of,
arising out of, or relating in any way to this [general agency agreement] or
any action taken or inaction by [Underwriters] in breach of the terms of this
[a]greement or the terms of the Reinsurance
Agreement.

The
agency agreement further provided that “[i]f
[Underwriters] does not indemnify and hold [State National] harmless . . .
[Arch] shall fulfill the obligations of [Underwriters] and make the payments
required” and that, conversely, “if [Arch] does not indemnify and hold [State
National] harmless as required by the [r]einsurance
[a]greement, [Underwriters] shall fulfill the
obligations of [Arch] and make the payments required pursuant to the [r]einsurance [a]greement.”

Arch
argues that to the extent that Underwriters claims that the amendment transfers
liability for losses over the caps to Underwriters, the plain terms of the
addendum contradict Underwriters’s interpretation of
the amendment.  Arch further argues that even if Underwriters’s
reading of the addendum were correct, State National’s risk is still affected
because State National selected Arch to be its reinsurer, not Underwriters, and
the shifting of liability would rewrite the benefits and risks bargained for by
State National.

Although
the only case on point that Underwriters cites is from Wisconsin,[7] we agree that if the modification of the
reinsurance agreement via Addendum No. 11 did not affect State National, then
Addendum No. 11 was a valid modification of the reinsurance agreement even
without State National’s consent.  We therefore consider whether Arch is
correct that the modification adversely affected State National.

The
reinsurance agreement provided that “[i]t is
understood that the [parties] hereto wish to enter into a reinsurance
arrangement through which [State National] is to bear no business, credit[,] or
insurance risk whatsoever (save the risk of [Arch’s] insolvency)” and
that “[a]ll provisions of this [reinsurance
agreement] shall be interpreted so as to be in accord with this” part of the
agreement. [Emphasis added.]  Under the agreement,
State National ceded to Arch, and Arch was required to accept, all of State
National’s gross liability under all policies issued by Underwriters in
Oklahoma on behalf of State National during the term of the agreement.

Thus,
the purpose of the agreement was to arrange for policies to be issued in
Oklahoma in State National’s name and for State National to incur no risk from
the issuance of these policies—except for the risk that Arch would become
insolvent.  To that end, the agreement provided that it terminated
immediately upon written notice by State National if Arch was found to be
insolvent or was placed in “supervision, conservation, rehabilitation, or
liquidation, or has a receiver or supervisor appointed.”  State National
could also immediately terminate the agreement as to Underwriters on the same
grounds.

The
reinsurance agreement further stated that Arch “shall assume and be liable for
and pay on behalf of [State National], 100% of all losses incurred in
connection with the risks covered by” the reinsurance agreement.  Article
VIII of the agreement provided that “[i]n
consideration of the acceptance by [Arch] of one hundred percent (100%) of
[State National’s] liability on Insurance business reinsured hereunder,
[Arch] is entitled to one hundred percent (100%) of the Net Premiums . . .
received by [Underwriters] or [Arch] on Policies reinsured,” less certain
deductions. [Emphasis added.]  The agreement also
provided that Underwriters and Arch could not assign any of their rights or
obligations under the agreement without State National’s consent and that the
agreement could be amended or modified only by a written instrument executed by
all of the parties.

Although
under the agreement State National ceded to Arch all of State National’s
liability under all policies issued under the agreement, Arch agreed to
indemnify State National for all risks from the policies, and the parties
agreed that State National would incur no risk under the agreement save the
risk of Arch’s insolvency, nothing in the agreement expressly gave State
National control over the business relationship between Arch and
Underwriters.  And other provisions in the reinsurance agreement show that
State National distanced itself from the business relationship between Arch and
Underwriters.  Arch promised not to try to recover from State National any
return commissions that Underwriters owed Arch but had failed to pay, and
Underwriters promised not to seek from State National any commissions that it
was owed by Arch.  And in Article XVIII of the reinsurance agreement, the
parties agreed that while for regulatory purposes, Underwriters would need to
be appointed as the agent of State National, the parties were expressly
recognizing that Underwriters was actually acting on behalf of Arch.  The
agreement stated that State National “is making no evaluation of [Underwriters’s] qualification” and that it had “no
obligation to furnish reports or statistics to [Arch], or to monitor the
performance of [Underwriters].”

Arch
is correct that in the reinsurance agreement, the parties agreed that State
National’s only risk would be Arch’s insolvency.  And Cleff
testified that he did not think Addendum No. 11 was clear about which party
would be required to pay the amount over the caps, “which is a significant
digression from the agreements as they would currently stand, which has Arch
paying them.”  He also stated that the addendum was therefore “a problem
for State National” because “the whole basis of our transaction is that Arch is
responsible for paying those losses.”  He also testified that State
National spends “a great deal of energy and resources making sure that the
reinsurer . . . has the financial wherewithal to meet . . . the policy
obligations.”

But
examination of the addendum leads to the conclusion that although the addendum
reallocated the risk of loss, it did not shift any of that risk back to State
National.  The addendum did not specify whether Underwriters was assuming
liability for any losses above the specified caps or whether Underwriters and
Arch hoped to obtain State National’s consent to release both parties from any
liability for such losses.  But because the parties could not bind State
National to the amendment without its consent and because State National’s
execution of the reinsurance agreement was premised on its avoidance of all
risk except the risk of Arch’s insolvency, the reasonable construction of the
addendum is that it requires Underwriters to hold Arch harmless for any
liability over the caps.[8] 
Without State National’s consent to the addendum, State National could still
hold Arch liable for all of the losses per the original terms of the
reinsurance agreement.  But in that case, then under our construction of
the addendum’s terms, Underwriters would owe Arch for any amount over the caps
that Arch had to pay to State National.  Thus, State National’s risk was
covered.  Arch would cover State National’s losses, and Underwriters would
reimburse Arch.  Arch and Underwriters were free to agree to split the
loss liability between them.

We
acknowledge that the general agency agreement contains the following provision:

Notwithstanding any provisions to the contrary contained
elsewhere herein or in any other document, it is expressly understood that the
execution and delivery of this [agency agreement] and [State National’s]
performance hereunder shall not under any circumstances be interpreted to
affect, weaken[,] or modify [Arch’s] obligation to
indemnify and hold [State National] harmless from and against the . . . risks
as set forth in the [r]einsurance [a]greement.  The contractual assumption by [Arch] of
these risks . . . is a condition precedent to [State National’s] entering into
this Agreement with [Underwriters].

But as
we have stated, Addendum No. 11 did not shift any risk of loss back to State
National.  And, under both the reinsurance agreement and general agency
agreement, State National could hold Arch liable for one hundred percent of any
losses notwithstanding the addendum’s attempt to cap Arch’s losses.  Under
our construction of Addendum No. 11, Arch could recover from Underwriters any
over-the-cap losses that Arch owed to State National.  Thus, as stated
above, although Arch and Underwriters agreed in the reinsurance agreement and
general agency agreement that Arch would bear one hundred percent of the risk
of loss, State National was not adversely affected by Addendum No. 11 because
State National retained its right under the reinsurance agreement and the general
agency agreement to have Arch cover all of its risk.

We
hold that because Addendum No. 11 did not have a substantial impact on State
National, State National’s consent was therefore not necessary to modify the
agreement as between Arch and Underwriters.[9]  We overrule Arch’s first issue.

Does
Addendum No. 11 violate the reinsurance agreement’s prohibition against
assignments?

The
second issue raised by Arch is whether Addendum No. 11 (or any other alleged
amendment) would violate the reinsurance agreement’s prohibition against
assignments were it to be construed as requiring Underwriters to pay amounts in
excess of the caps.  Arch argues that such a construction would, as a
matter of law, violate the agreement’s anti-assignment provision, which
prohibits assignment of any of the rights or obligations under the agreement
without State National’s consent.

Under
our construction of Addendum No. 11, the addendum did not assign away any of
State National’s rights.  Nor did it assign to Underwriters Arch’s duty
under the reinsurance agreement to indemnify State National for one hundred
percent of State National’s losses.  It merely gave Arch the right to
recover from Underwriters any amount over a cap that it was required to pay to
State National.  Furthermore, notwithstanding the anti-assignment
language, parties may choose to modify contractual obligations,[10] and because the modification did not
substantially affect State National’s rights or obligations under the contract,
its consent was not necessary.[11] 
We overrule Arch’s second issue.

Were
the jury’s findings on questions 1A and 1B immaterial?

Arch
asks in its third issue whether the jury’s findings to questions 1A and 1B are legally immaterial,
especially given that the relevant inquiry was whether all three parties agreed
to modify the reinsurance agreement and that there was no evidence that State
National had agreed to a modification.  Question number one part A asked
whether Arch had agreed to modify the reinsurance agreement in 2007 to excuse Underwriters’s liability for return commissions for each
agreement year, and part B asked whether Arch had agreed to revise
Underwriter’s minimum commission to thirty percent for each agreement
year.  The jury answered “yes” to both parts of the question.

Arch
argues that because all three parties had to agree to Addendum No. 11 (or any
other modification), it was legally immaterial whether Arch and Underwriters
alone had agreed to it.  Because we have held that State National’s
consent was not required for the modifications that the jury was asked about,
we overrule Arch’s third issue.

Was the
evidence insufficient to support the jury’s answers to questions 1A and 1B?

Arch’s
fourth issue asks whether the evidence is legally and factually insufficient to
support the jury’s answers to questions 1A and 1B.  Arch argues that even if questions 1A and 1B were not immaterial,
the evidence was insufficient to support the jury’s answers to them.

Arch’s
argument under this issue is based on State National’s failure to consent to
Addendum No. 11.  It argues that it had withdrawn its agreement to Addendum
No. 11 before State National even considered the addendum, that State National
never agreed to the addendum, and that, therefore, Addendum No. 11 never became
effective.  Because we have held that State National’s consent was not
required in order for Arch and Underwriters to modify the reinsurance agreement
as between themselves, we overrule this
argument.  We therefore do not address Underwriters’s
counterarguments that Arch could not revoke its acceptance because it has
already begun performing under the modified agreement or that Arch waived its
revocation-of-acceptance argument.  Because we have held that  Addendum No. 11 was an effective modification of
the reinsurance agreement, we also do not reach Arch’s argument that no other
communications between it and Underwriters served to modify the reinsurance
agreement, and we overrule Arch’s fourth issue.[12]

Did
Underwriters fail to establish its equitable estoppel defense?

Arch’s
fifth, sixth, seventh, and eighth issues address Underwriters’s
defense of equitable estoppel in which Underwriters had asserted that Arch was estopped from arguing that the addendum was invalid because
State National had not consented to it.  Because we have held that State
National’s consent was unnecessary, we need not address these issues.[13]

Is
Addendum No. 11 unenforceable for lack of consideration?

Arch’s
ninth issue is whether Addendum No. 11 can be enforced between
Underwriters and Arch when it lacks consideration.[14]  Generally, what constitutes
consideration is a question of law.[15] 
We therefore review Addendum No. 11 de novo to determine whether it provides
consideration to modify the reinsurance agreement.

Arch
argues that the only real potential benefit it could have received from
Addendum No. 11 was the cap on Arch’s liability to State National for 2002
through 2005, which would allow Arch to reduce its reserves.  Arch then argues
that this liability cap was a benefit that Arch did not receive and could not
have received because State National did not agree to relieve Arch of liability
and could not have been compelled to do so.  Arch contends that because
State National did not agree to cap Arch’s liability as provided in the
addendum, the addendum lacked consideration, making it unenforceable.

Although
Arch was not released from its obligation to indemnify State National, Arch
gained the right to be reimbursed from Arch for amounts over the cap.  We
therefore disagree with Arch that the liability cap was a benefit that Arch did
not and could not receive.[16]
 Because this benefit constituted sufficient consideration, we need not
consider Arch’s argument that the addendum’s reduction of the maximum
commission it would have to pay was not consideration for the agreement.[17]  We overrule Arch’s ninth issue.

Is
Addendum No. 11 retroactive?

Arch
asks under its tenth issue whether Addendum No. 11, if valid, is not
retroactive as a matter of law, such that the addendum cannot excuse amounts
owed by Underwriters prior to the addendum’s effective date.  Arch’s
position is that even if the addendum were valid, it would not apply
retroactively to forgive the commissions Underwriters owed to Arch for the
agreement years 2003 through 2006 because the addendum has no language showing
an intent to discharge the $1,374,972 in adjusted commissions that were owed
for the years ending before March 1, 2007, the effective date of the
addendum.  Arch argues that, accordingly, the trial court committed
reversible error by failing to render judgment in Arch’s favor for $1,374,972
for the return commissions due under the reinsurance agreement.

We
construe Addendum No. 11 as a matter of law to determine whether it applies
retroactively.[18] 
As discussed above, the addendum states, “Effective as of March 1, 2007, and
pertaining to all liabilities that are applicable to [the reinsurance
agreement], the loss and loss adjustment expense are capped” per the scale set
out in the addendum.  The addendum also modified section 8.06(a) of the
reinsurance agreement by replacing the method for calculating the adjusted
commission rate with a new method, one that would entitle Underwriters to a
minimum thirty percent commission.  The new section 8.06(a) stated that it
“applied to ceded premiums earned for the Agreement
Year under consideration.”

Arch
argues that an amendment to a contract does not discharge obligations that
exist under the contract unless there is express language evidencing such an intent.[19]
 And Arch is correct that the addendum does not expressly state that it
should be applied retroactively.  But Addendum No. 11 modified the
reinsurance agreement to provide a new method for calculating the “ceded
premiums earned for the Agreement Year under consideration.”  Thus,
anytime after the effective date of the modification, when Underwriters
calculated the ceded premium for any particular agreement year for which it had
not already done so, it would use the new formula.

Furthermore,
to the extent that the language of the addendum was ambiguous as to whether
Arch and Underwriters intended to discharge any return commissions owed by
Underwriters, the jury specifically found that Arch had agreed to modify the
reinsurance agreement to excuse Underwriters’s
liability to return commissions for each agreement year.[20]  The jury’s answer is supported not
only by evidence at trial that the parties understood that the addendum would
have retroactive effect, but also by the fact that under the reinsurance
agreement’s termination provisions, Arch had the right to terminate the
agreement after thirty days’ written notice to Underwriters if Underwriters
failed to pay to Arch all payments of premiums due, and it opted not to do so
despite the fact that Underwriters had not paid all of the premiums due for
several years.  We overrule Arch’s tenth issue.

Was
Underwriters entitled to summary judgment on Arch’s fraudulent inducement
claim?

In
its eleventh issue, Arch asks whether the trial court erred by granting Underwriters’s motion for summary judgment on Arch’s
fraudulent inducement claim and whether the trial court abused its discretion
by denying Arch’s motions to compel.  We review a summary judgment de
novo.[21] 
We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding
evidence contrary to the nonmovant unless reasonable
jurors could not.[22] 
We indulge every reasonable inference and resolve any doubts in the nonmovant’s favor.[23] 
A defendant who conclusively negates at least one essential element of a cause
of action is entitled to summary judgment on that claim.[24]

After
an adequate time for discovery, the party without the burden of proof may,
without presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant’s
claim or defense.[25] 
The motion must specifically state the elements for which there is no evidence.[26]  The trial court must grant the
motion unless the nonmovant produces summary judgment
evidence that raises a genuine issue of material fact.[27]

When
a party moves for both a traditional and a no-evidence summary judgment, we
generally first review the trial court’s summary judgment under no-evidence
standards.[28]
 When the trial court does not specify the basis for its summary judgment,
the appealing party must show it is error to base it on any ground asserted in
the motion, and this court must affirm the summary judgment if any one of the movant’s theories has merit.[29]

Fraudulent
Inducement By Non-Disclosure.

Arch
argues that the trial court erred by granting summary judgment on its fraud claims. 
Arch alleged in the trial court that Underwriters fraudulently induced it to
enter into Addendum No. 11, both by failing to disclose information it had a
duty to disclose and by making an affirmative misrepresentation. 
Underwriters moved for traditional and no-evidence summary judgment on Arch’s
fraud claims.  In its no-evidence motion, Underwriters argued that there
was no evidence on the elements of fraudulent inducement, including the element
of reliance.  The trial court granted summary judgment without specifying
the grounds on which it based its ruling.[30]

On
appeal, regarding its claim for fraudulent inducement by nondisclosure, Arch
argues that (1) the trial court should have applied Oklahoma law rather than
Texas law, (2) Underwriters had a duty to disclose to Arch the amount of return
commissions owed to Arch but failed to so, and (3) Arch relied on Underwriters’s nondisclosure.

In
its response to Underwriters’s summary judgment
motion, Arch pointed to excerpts from two affidavits to show that Arch had
relied on Underwriters’s failure to disclose the
amount of return commissions owed to Arch.  The first excerpt was from the
affidavit of Joseph King, who from late 2001 through March 2006 was the head of
the property underwriting department at Arch.  King stated that he would
never have recommended renewal of the reinsurance agreement in 2006 to Arch’s
management had Underwriters advised Arch that Underwriters owed Arch “a
significant amount of return commissions that it had failed to report or pay
when due and had no intention of paying.”  The second excerpt was from the
affidavit of Douglas Morrison, who served as the head of the property
underwriting department after King left Arch.  In the part of the affidavit
relied on by Arch, Morrison stated, “Had I known that [Underwriters] was
withholding material information from [Arch] in breach of its obligations,
[Arch] would not have approved any continuation of [Arch’s] relationship with
[Underwriters] into the 2007 agreement year.”  Arch argued in its response
that this testimony shows that “[i]f [Underwriters]
had provided [Arch] with just one of the commission-adjustment reports it had
prepared between 2005 and 2007, [Arch] would have demanded payment, absent
which it would have ended the parties’ relationship.”

Arch
argues that these excerpts show that Arch would not have continued dealing with
Underwriters if Underwriters had disclosed the amount of return commissions due
to Arch.  But the fraudulent inducement claim was aimed at rescission of
Addendum No. 11.  None of the evidence relied on by Arch came from Glick,
the Arch representative who executed Addendum No. 11 on behalf of Arch, or from
any other Arch representative who was involved in the negotiations.  The
statements contain mere speculation about what Arch might have done prior to
Glick’s execution of Addendum No. 11 if it had had the information provided to
it.  They do not show that anyone at Arch agreed to Addendum No. 11 based
on representations by Underwriters about the commissions.  And Glick
stated in his deposition testimony that in the negotiations, the amount of
return commissions came up and was discussed in connection with the discussions
regarding renewal of the reinsurance agreement.  Thus, Glick—who
negotiated Addendum No. 11—was aware of at least the approximate amount of
return commissions then owed.  Accordingly, we hold that the trial court
did not err by granting no-evidence summary judgment on Arch’s fraudulent
inducement claim based on failure to disclose.

Fraud
by Affirmative Misrepresentation.

Regarding
Arch’s claim for fraudulent inducement by misrepresentation, it argues that
Underwriters “misrepresented to Glick that [its] financial condition was such
that the minimum 27% commission was no longer feasible” and that Glick relied
on these representations to Arch’s detriment.

In
response to Underwriters’s summary judgment ground
that there was no evidence of justifiable reliance by Arch on an actionable
misrepresentation by Underwriters, Arch pointed to deposition testimony by
Glick; a report written by Glick after a February 2007 meeting with Underwriters’s representatives; deposition testimony by
Steve Harvey, president of Underwriters; and deposition testimony of Sharron
Barton, an Underwriters employee.  The deposition testimony showed (1)
that Underwriters told Glick that the twenty-seven percent was a difficult
minimum for it to work with and that Underwriters was not making as much money
on the deal as it would have liked, and (2) that Glick had responded that if it
was not a good deal for Underwriters, then it was not a good deal for Arch, and
that if Underwriters were not in business then “we don’t have an opportunity to
make money on the program.”  Glick’s report stated that Underwriters
wanted the commission raised to thirty percent and was willing to adjust the
commission scale so that it received a lower commission “of the upside,” that
is, if Arch’s losses were less than expected.  None of the evidence
pointed out by Arch shows that Glick relied on any affirmative representations
by Underwriters about its financial condition in making his decision to execute
Addendum No. 11.  Thus, the trial court did not err by granting summary
judgment on this claim.[31]

Because
Arch failed to produce sufficient summary judgment evidence to show that Glick
relied on representations about Underwriters’s
financial position, we do not reach Arch’s argument that the trial court abused
its discretion by failing to compel discovery about Underwriters’s
financial situation or that the trial court erred by granting summary judgment
for Underwriters based on the economic loss rule.  We overrule Arch’s
eleventh issue.

Is
either party entitled to attorney’s fees?

In
its twelfth issue, Arch asks whether the trial court erred by awarding Underwriters’s attorney’s fees.  In its thirteenth and
final issue, Arch asks whether it is entitled to attorney’s fees as a matter of
law.

Under
its twelfth issue, Arch argues that as a matter of law, Underwriters was not
entitled to the attorney’s fees awarded to it by the trial court;
alternatively, Arch argues that the trial court abused its discretion by
awarding them.  Arch contends that Underwriters’s
claim for declaratory relief was duplicative of the issues litigated on Arch’s
breach of contract claim, and therefore, Underwriters was not entitled to
attorney’s fees.

We
review a trial court’s grant of attorney’s fees in a declaratory judgment
action for abuse of discretion.[32]
 Under the Texas Declaratory Judgment Act (the DJA),
a court “may award costs and reasonable and necessary attorney’s fees as are
equitable and just.”[33]

On
May 10, 2010, Arch sought to amend its pleadings to, among other things, drop
its declaratory judgment claim.  Underwriters then moved to amend its
answer in order to file a counterclaim for declaratory relief.  It asked
for a declaration that Addendum No. 11 was valid and enforceable.  In
Arch’s third amended petition, it asserted a claim for breach of contract as
well as a claim for fraudulent inducement challenging the validity of Addendum
No. 11.  Thus, Underwriters did not seek additional relief that had
greater ramifications than Arch’s original suit, and its claim merely addressed
issues already pending before the court.[34]  Accordingly, Underwriters’s
DJA claim was not proper, and, therefore, the trial
court abused its discretion by awarding attorney’s fees to Underwriters based
on its declaratory judgment claim.  Because Underwriters did not assert
any other ground for recovering attorney’s fees, we sustain Arch’s twelfth
issue.

In
its thirteenth issue, Arch argues that it established its breach of contract
claim as a matter of law, that judgment should therefore be rendered in its
favor, and that the case should be remanded to the trial court for a
determination of its attorney’s fees.  Because we have held that the trial
court did not err by rendering judgment for Underwriters, we overrule this
issue.

Conclusion

Having
sustained Arch’s twelfth issue, we modify the trial court’s judgment to omit
the award of attorney’s fees to Underwriters.  Having overruled Arch’s
remaining twelve issues, we affirm the remainder of
the trial court’s judgment as modified.

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; DAUPHINOT, J.; and DIXON HOLMAN
(Senior Justice, Retired, Sitting by Assignment).

 

DELIVERED: April 26, 2012














[1]See
Tex. R. App. P. 47.4.





[2]See
Gamma Grp., Inc. v. Transatlantic Reinsurance Co.,
242 S.W.3d 203, 205 n.1
(Tex. App.—Dallas 2007, pet. denied) (“‘Reinsurance’” is a means whereby a
company that issues an insurance policy can allocate or ‘cede’ a portion of the
risk it bears on that policy to another insurance company in return for a
portion of the premium.”).





[3]See
Johnson & Higgins of Tex., Inc. v. Kenneco
Energy, Inc., 962 S.W.2d 507, 515–16 (Tex. 1998)
(setting out the elements of equitable estoppel).





[4]Tex.
Civ. Prac. & Rem. Code Ann. §
37.009 (West 2008).





[5]San Antonio Mach. & Supply Co. v. Allen, 268 S.W. 532,
533 (Tex. Civ. App.—San Antonio 1925, no writ).





[6]See
Mandril v. Kasishke,
620 S.W.2d 238, 244 (Tex. Civ. App.—Amarillo 1981,
writ ref’d n.r.e.) (stating that for contract modification, there must be a
meeting of the minds of the parties and that the terms of the original contract
cannot be unilaterally remade by one of the parties).  Underwriters also
cites a federal case, Hondo Oil & Gas Co. v. Tex. Crude Operator, Inc.,
970 F.2d 1433 (5th Cir. 1992), but the facts and
contractual relationship in that case differ from the facts and the contractual
relationship at issue in this case so as to make that case not directly on
point.





[7]See
Lakeshore Commercial Fin. Corp. v. Drobac, 319 N.W.2d 839, 840 (Wisc. 1982)
(holding that with respect to a multi-party contract, when some but not all of
the original signatories execute a modification to the contract, those
signatories “can validly alter the contract in respect to each other, but that
they cannot change the rights or obligations under the contract of an original
signatory who did not join in the modification”).





[8]See
7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys.,
Inc., 245 S.W.3d 488, 500 (Tex. App.—Houston
[14th Dist.] 2007, pet. denied) (“We construe a contract by determining how the
‘reasonable person’ would have used and understood its language, considering
the circumstances surrounding the contract’s negotiation and keeping in mind the
purposes intended to be accomplished by the parties when entering into the
contract.”).





[9]See
Drobac, 319 N.W.2d at 840.





[10]See
Berkman v. D.M. Oberman Mfg. Co., 230 S.W. 838, 841 (Tex. Civ.
App.—Austin 1921, writ dism’d w.o.j.) (noting that any of the terms or
conditions of a contract may be modified by agreement of the parties).





[11]See
Drobac, 319 N.W.2d at 840.





[12]See
Tex. R. App. P. 47.1.





[13]See
id.





[14]See
Arthur J. Gallagher & Co. v. Dieterich, 270 S.W.3d 695, 702 (Tex. App.—Dallas 2008, no pet.) (stating that a contract modification requires “a meeting
of the minds supported by consideration” and that consideration “may consist of
a benefit that accrues to one party or a detriment incurred by the other
party”); see also Frequent Flyer Depot, Inc. v. Am. Airlines, Inc., 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied)
(“Consideration may consist of either benefits or detriments to the contracting
parties; it may consist of some right, interest, profit, or benefit that
accrues to one party, or alternatively, of some forbearance, loss, or
responsibility that is undertaken or incurred by the other party”).





[15]See
Colligan v. Smith, 366 S.W.2d
816, 818 (Tex. Civ. App.—Fort Worth 1963, writ ref’d n.r.e.) (providing that whether contract
was void and unenforceable for lack of consideration was a question of law);
Brownwood Ross Co. v. Maverick Cnty., 936 S.W.2d 42, 45 (Tex. App.—San Antonio 1996, writ denied).





[16]See
Frequent Flyer Depot, 281 S.W.3d at 224; Dieterich, 270 S.W.3d at 702.





[17]See
Tex. R. App. P. 47.1.





[18]See
Praeger v. Wilson, 721 S.W.2d
597, 600 (Tex. App.—Fort Worth 1986, writ ref’d n.r.e.) (stating that where neither party
has alleged that a contract is ambiguous, construction of the contract is a
question of law for the court).





[19]See
Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc., 390 F.3d 336, 342 (5th Cir. 2004) (“Texas courts have made
clear that rights or obligations that may have vested or accrued under previous
versions of a contract can only be modified or extinguished through the
inclusion of express language that manifests such intent.”).





[20]Phila. Am. Life
Ins. Co. v. Turner, 131 S.W.3d 576, 588 (Tex.
App.—Fort Worth 2004, no pet.) (noting
that if a contract is ambiguous, the intentions of the parties becomes a fact
question for the jury).





[21]Travelers Ins. Co. v. Joachim, 315 S.W.3d
860, 862 (Tex. 2010).





[22]Mann Frankfort Stein & Lipp
Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848
(Tex. 2009).





[23]20801, Inc. v. Parker, 249 S.W.3d
392, 399 (Tex. 2008).





[24]Frost
Nat’l Bank v. Fernandez, 315 S.W.3d 494, 508
(Tex. 2010); see Tex. R. Civ. P. 166a(b), (c).





[25]Tex.
R. Civ. P. 166a(i).





[26]Id.; Timpte Indus., Inc.
v. Gish, 286 S.W.3d 306, 310 (Tex. 2009).





[27]See
Tex. R. Civ. P. 166a(i) & cmt.;
Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex.
2008).





[28]See
Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600
(Tex. 2004); All Am. Tel., Inc. v. USLD Commc’ns, Inc., 291 S.W.3d
518, 526 (Tex. App.—Fort Worth 2009, pet. denied).





 [29]Star–Telegram, Inc. v. Doe, 915 S.W.2d
471, 473 (Tex. 1995) (citations omitted).





[30]See
id.





[31]See
Tex. R. Civ. P. 166a(i) & cmt.





[32]NP Anderson Cotton Exch., L.P. v. Potter, 230 S.W.3d 457, 466 (Tex. App.—Fort Worth 2007, no pet.).





[33]Tex.
Civ. Prac. & Rem. Code
Ann. § 37.009; see also Potter, 230 S.W.3d at
466.





[34]See
BHP Petroleum Co. Inc. v. Millard, 800 S.W.2d 838, 841 (Tex. 1990) (stating that the DJA is not available to settle disputes already pending
before a court and noting that “[t]o qualify as a claim for affirmative relief,
a defensive pleading must allege that the defendant has a cause of action,
independent of the plaintiff’s claim, on which he could recover benefits,
compensation or relief, even though the plaintiff may abandon his cause of
action or fail to establish it”).